UNITED STATES, Appellee

v.

BELL BEE STRONG, Private, U. S. Army, Appellant

1 USCMA 627, 5 CMR 55

628

No. 244

Decided August 27, 1952

COL. M. W. Ludington, USA, LT. COL. James C. Hamilton, USA, 1ST LT. Thomas E. Cole, USA, and 1ST LT. Charles H. Taylor, USA, for Appellant.

LT. COL. Paul J. Leahy, USA, and 1ST LT. Richard L. Brown, USA, for Appellee.

## Opinion of the Court

PAUL W. BROSMAN, Judge:

This case is before us on petition for review granted December 26, 1951, pursuant to the provisions of the Uniform Code of Military Justice, Article 67 (b) (3), 50 USC § 654. Petitioner was charged with absence without leave in violation of Article of War 61, 10 USC § 1533, and voluntary manslaughter in violation of Article of War 93, 10 USC § 1565. The specification of the first charge alleged that petitioner, a member of the 595th Engineer Dump Truck Company, absented himself from his organization without proper leave at Songwhan, Korea, from about May 29, 1951, until about June 18, 1951. The specification of the second charge alleged that petitioner feloniously, willfully, and unlawfully killed one Kwon Tai Hi by shooting him in the body with a carbine on or about May 29, 1951, at or near Songwhan, Korea. Upon trial by general court-martial the accused pleaded not guilty to all charges and specifications but was found guilty as charged. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for six years. The findings and sentence were approved by the convening authority, and affirmed without opinion by a board of review in the office of The Judge Advocate General, United States Army.

## II

The record discloses that on May 29, 1951, the accused and two other soldiers, Corporal Frank Tyner and Private First Class Bernoff Norris, were working with a detail of Korean laborers in the vicinity of Songwhan, Korea. Corporal Tyner was in charge of the detail, which was engaged in spreading gravel on roads near Songwhan. During the lunch period the Korean group dispersed, and Corporal Tyner directed Private Norris to reassemble its members. Norris called to the men, but they did not heed his shouts. Corporal Tyner then ordered Norris to fire a warning shot to attract their attention. The latter did so and the Koreans began to return. After Norris fired, the accused also discharged his carbine. His shot was directed toward a group of Koreans, the bullet striking the ground between two of their number. Some two or three minutes later the corporal and Private Norris heard a further shot, after which the accused was seen running down the hill toward a Korean lying on the ground. When Corporal Tyner reached the Korean, petitioner told him that he had shot the man accidentally. It appears that the victim, one Kwon Tai Hi, was shot in the stomach. His death the following day was established through stipulated medical testimony.

The accused, after being advised of his rights as a witness, was sworn and testified that he was shooting at a magpie and accidentally struck one of two Koreans. He stated that before firing he looked to see if any persons were near, that he saw the victim walking in a field and another Korean running toward a path, but that he concluded he could fire at the magpie with safety. There is evidence that petitioner was unacquainted with the deceased, that he had never spoken to him, and that he had been in no difficulty with the deceased nor with any other member of the work party.

The order granting the accused's petition for review limited briefs and argument to the following issues:

(1) Whether the evidence was sufficient as a matter of law to sustain the findings of guilty of voluntary manslaughter.

(2) Whether the failure of the law officer to instruct the court concerning the elements of the offense of voluntary manslaughter was error and prejudicial to the accused.

(3) Whether the evidence was sufficient as a matter of law to sustain the findings of guilty of absence without leave as alleged.

### III

We shall first deal with the second issue mentioned above. The record shows that at the conclusion of arguments of counsel, the law officer instructed the court as follows with regard to the offense of voluntary manslaughter:

"The court is advised that the elements of the offenses are as follows:

• • • • • • •

"As to Charge II:

a. That the accused unlawfully killed a certain person named by certain means as alleged;

b. That the alleged victim is dead;

c. That his death resulted from an injury received by him;

d. That such injury resulted from an act of the accused; and,

e. That death occurred within a year and a day of such act.

"For a discussion of the offense of voluntary manslaughter, the court is referred to paragraph 180a, Manual for Courts-Martial 1949, pages 233 and 234."

Voluntary manslaughter is defined by the Manual for Courts-Martial, U. S. Army, 1949, paragraph 180a, as ". . . homicide caused by an act likely to result in death, intentionally committed in the heat of sudden passion brought about by provocation." It is apparent from a reading of the instructions quoted above that the law officer failed to afford the court complete instructions as to the elements of this offense. In view of the mandatory requirement of the Uniform Code of Military Justice, Article 51(c), 50 USC § 626, that the law officer of a general court-martial instruct the court on the elements of the offense charged, in the presence of the accused and counsel, it is obvious that the law officer's omission constitutes error. The Government concedes that the law officer neglected to instruct the court fully, but takes the position that this failure was not prejudicial to the accused's rights because the court was referred to a full and complete Manual discussion of the offense charged. It is urged that this reference to the applicable subparagraph of the Manual constitutes compliance with the requirements of Article 51(c), supra, and the Manual for Courts-Martial, United States, 1951, paragraph 73. In advancing this argument the Government relies heavily on the reasoning of United States v. Shepard, CM 347972, decided November 1, 1951. In this case an Army board of review held that the failure of the law officer to state the elements of the offense charged did not constitute prejudicial error inasmuch as he referred the members of the court-martial to appropriate pages of the Manual for Courts-Martial, U. S. Army, 1949, where a treatment of the ingredients of the crime might be found. The board went on to say in the Shepard case that:

". . . . It may be assumed that the court, pursuant to the law officer's instructions, in its deliberations on the findings, acquainted itself with the elements of proof thereof."

Appellate Government counsel also urges that the 1951 Manual indicates that the law officer—in addition to charging on the elements of the offense alleged, reasonable doubt and related matters—should further instruct the members of the court-martial to ". . . observe the rules set forth in paragraph 74a, Manual for Courts-Martial." See Manual for Courts-Martial, United States, 1951, Appendix 8, page 518. It is asserted that the plain intention of this language from the Manual's trial procedure guide is that members of the court shall have and shall use the Manual in their deliberations on findings and sentence. We are further assured that, in view of the specific provision of this procedure, ". . . it cannot in good conscience be said that, having been so advised, the members of the court would deliberately fail to consider the principles contained in the paragraph to which they had been referred." Similarly it is said that, when the law officer refers to Manual provisions as to offense elements the court in keeping with the spirit of the law will turn to and utilize them. This, it is urgently suggested, constitutes a compliance with Article 51(c), supra.

We are not persuaded by these arguments. The Uniform Code, 50 USC §§ 551–736, in clear and unmistakable terms, commands that the law officer of a general court-martial shall, in the presence of the accused and counsel, instruct the court as to the elements of the offense. This constitutes one of the most significant respects in which the current dispensation of military justice differs from the old. Had Congress deemed a mere reference to the applicable paragraph or subparagraph of the Manual an acceptable procedure, it would have been a comparatively simple matter to have provided to this effect. We are certainly not unmindful of the fact that under the older practice a professionally certified law member sat with the court during its deliberations. Under the present scheme no such legal

adviser is near its members at these crucial moments. So far as we can believe with assurance, all of the law applicable to the case before it with which the court-martial's members are familiar is that upon which they are explicitly instructed by the law officer.

The instructions in the instant case are analogous to those given by the law officer in United States v. Gilbertson (No. 318), 1 USCMA 465, 4 CMR 57, decided July 22, 1952. There, in instructing the members of the court on the elements of the offense of misbehavior before the enemy, he stated:

". . . that the accused was serving in the presence of an enemy; and acts or omissions constituting misbehavior of the accused as alleged. The court's attention is invited to paragraph 163, page 216, MCM, 1949, as to the discussion of the offense in Charge 1. . . ."

The similarity between that case and the present one is apparent. In both, the law officer's instructions merely followed the "elements" enumerated under the applicable Manual subparagraph "Proof." Likewise in both instances these instructions contained no legal standard by which to measure the accused's guilt or innocence of the offense charged. In United States v. Gilbertson, supra, we said:

". . . This instruction follows precisely the 'elements' listed in the Manual discussion of the offenses, but obviously contains no legal standard of misbehavior. . . .

"It is, however, contended by the Government that the instruction was saved by the law officer's reference to the Manual paragraph for a discussion of the term 'misbehavior.' We are not impressed with this argument. . . ."

Federal cases of the civilian community support the conclusion reached by us in Gilbertson. See United States v. Noble, 155 F2d 315 (CA3d Cir); Morris v. United States, 156 F2d 525 (CA9th Cir); United States v. Max, 156 F2d 13 (CA3d Cir). Following a reference to the Federal rule, we used the following language in the Gilbertson case:

". . . . The reasons given in these Federal cases for requiring full oral instruction are sound, and become even more persuasive when applied to courts-martial procedure. If the law officer merely refers to a Manual discussion of the offense, we have no guarantee that the members will read the pertinent parts. Further, they may not understand it and may well be confused by additional matter appearing in the text, not applicable to the case before them. The law officer of a general court and the president of a special court must endeavor to fulfill his responsibility to act as near like a civilian judge as possible. This responsibility cannot be met by a perfunctory disposition of matters where an individual's life or freedom is in the balance. The accused and his counsel have the right to hear instructions which form the framework of law to which the evidence must be fitted. These instructions should be clear, simple, precise and unambiguous. If full instructions are not given in open court, defense cannot evaluate their correctness and has no opportunity to object. Further, if no affirmative statement of the instructions appears in the record, reviewing authorities are handicapped in ascertaining the legal standard applied by the court in its deliberations on the findings."

In this language we sought to express our reasons for believing that the error of a Manual reference to offense elements does materially prejudice the substantial rights of an accused person. We hold that the responsibility of the law officer in the present case distinctly was not met by his summary reference to Manual discussion. We, therefore, conclude, as we did in Gilbertson "that referral to the Manual does not constitute an adequate instruction and cannot cure an otherwise inadequate instruction." This infirmity requires reversal. It is not for us to determine what the members of this court would have found had they been advised properly concerning the elements of voluntary manslaughter. See United States v. Rhoden (No. 153) 1 USCMA 193, 2 CMR 99, decided February 26, 1952; United States v. Gilbertson, supra; Little v. United States, 73 F2d 861 (CA10th Cir).

IV

We now turn to the question of waiver raised by the Government. Conceding the error adverted to █ above, it is urged that petitioner's acquiescence at the trial in the instructions given constituted a waiver of any objection thereto. This argument is predicated on the following colloquy between the law officer and counsel reported at page 53 of the record:

"LO: Does the trial counsel or the defense counsel have any additional instructions or suggested instructions to be given at this time?

DC: *The defense does not.*

TC: The prosecution does not.

LO: The court will be closed." [Emphasis supplied]

It is asserted that this amounted to a formal and express approval of the law officer's instructions, which, under the principle applied in Johnson v. United States, 318 US 189, 87 L ed 704, 63 S Ct 549, bars petitioner from urging error on appeal. We find the argument to be without merit for two reasons. First, we believe the cited case is distinguishable from the case at bar. While it is true that the Supreme Court found waiver in Johnson, that case presented a situation in which defense counsel had objected to the prosecutor's comment on the petitioner's refusal to testify and later withdrew his objection. Thereafter, when invited by the court to bring to its attention any objections or requests to charge he might have, defense counsel wholly failed to renew his objection. Thus, the Court declared at page 200:

". . . We can only conclude that petitioner expressly waived any objection to the prosecutor's comment by withdrawing his exception to it and by acquiescing in the treatment of the matter by the court. . . . This is a case where silent approval of the course followed by the court (Boyd v. United States, 271 US 104,

**633**

108) is accompanied by an express waiver of a prior objection to the method by which the claim of privilege was treated. . . ."

Such was not at all the case here, where defense counsel was asked if he had any additional or suggested instructions to offer. He merely replied that he had not.

In the second place, and apart from what has been said in distinguishing Johnson, we do not believe that the equivocal action of defense counsel in this case reached the level of waiver of the accused's fundamental right—granted by Congress in clear and unambiguous language—that the court-martial be instructed as to the elements of the offense for the commission of which he was being tried. In effect defense counsel's action amounted to little, if any, more than a mere failure to object. Our views on this question have been expressed in several recent cases. See United States v. Clay (No. 49), 1 USCMA 74, 1 CMR 74, decided November 27, 1951; United States v. Cromartie (No. 374), 4 CMR 143, decided August 6, 1952. See also Screws v. United States, 325 US 91, 89 L ed 1495, 65 S Ct 1031, 162 ALR 1330. Of course we do not mean to say in this connection that a defense counsel may under no circumstances effect a valid waiver in a situation similar to the present one. This question may safely be left for future determination. We merely hold that defense counsel's conduct in the case at bar did not constitute such a waiver.

V

A further matter deserving of brief mention has to do with the law officer's failure to instruct as to ▬▬▬ lesser included offenses fairly raised by the evidence. Although petitioner was convicted of voluntary manslaughter as charged, the evidence reasonably considered would readily have allowed the court-martial to find him guilty of a lesser degree of homicide. For example, the court could have found that the accused acted in a culpably negligent manner in discharging his weapon in an area in which he knew persons were present. This would have permitted a finding of involuntary manslaughter. See Manual for Courts-Martial, U. S. Army, 1949, paragraph 180a, page 234. Or, without determination of culpable negligence, the evidence here could also have supported a finding of negligent homicide in violation of Article of War 96, 10 USC § 1568. See Manual for Courts-Martial, supra, paragraph 180a, page 234. In the instant case the law officer neither mentioned nor defined the elements of any lesser included offense. Obviously this was error. As we stated in United States v. Clark (No. 190), 1 USCMA 201, 2 CMR 107, decided February 29, 1952:

". . . Correct procedure under military law requires that, unless the evidence excludes any reasonable inference that a lesser crime was committed, the duty of the law officer is to carve out instructions covering the offense. He is the judge in the military system and he must furnish to the court the legal framework of all offenses which the evidence tends to establish. Unless he does so the accused has been denied a right which we conclude was granted by Congress and error as a matter of law follows."

That this error was prejudicial to the accused's rights is also clear. In United States v. Drew (No. 422), 1 USCMA 471, 4 CMR 63, decided July 22, 1952, we announced that:

"The failure of the law officer to define voluntary manslaughter, to indicate the legal effect of proof of intoxication, and to define the applicable lesser included offenses raised as alternatives by the evidence constitutes error. It is not for us to determine precisely what the court would have found had it been correctly instructed. *Considering the evidence, there is a reasonable possibility that, had full and correct instructions been given, the court would have found petitioner guilty of a lesser offense. This is sufficient reason upon which to base a finding of prejudice. . . .*" [Emphasis supplied]

VI

We turn next to the question of suffi-

634

ciency of the evidence as a matter of law to sustain the findings of guilty of absence without leave from May 29, 1951, to about June 15, 1951. To establish the period of unauthorized absence the prosecution introduced two duly authenticated extract copies of morning reports of the accused's company. The first was dated June 20, 1951, and bore the following entry:

"CORRECTION (29 May 1951)
Omitted
SHOULD BE
Strong Bell B RA 17188138 Pvt–2
 4931
Fr dy to AWOL 1540 hours"
(Prosecution Exhibit 1)

The second extract copy was dated June 18, 1951, and read as follows:

"Strong Bell B RA17188138 Pvt–2 4931
Fr AWOL to conf Post Guardhouse Hq
 548th
Engr Svc Bn APO 301"
(Prosecution Exhibit 2)

Both entries were signed by Captain Lowell O. Tripp, CE, Commanding Officer. The first of these entries established May 29, 1951, as the date of the inception of the unauthorized absence, and the second reported that on June 18, 1951, the unauthorized absence was terminated and the accused confined to the post guardhouse.

The defense introduced in evidence a further duly authenticated extract copy of the morning report of the accused's company, dated May 31, 1951, and bearing the following entry:

"Strong Bell B RA17188138 Pvt–2 4931
Fr dy to AWOL 0640"
(Defense Exhibit A)

The above entry was also signed by Captain Tripp. This officer was recalled as a witness by the law officer and testified, in pertinent part, as follows:

"Private Strong went AWOL on or about the 29th of May. . . . The incident was reported to me the next morning by Lieutenant Slocomb; That the incident occurred the afternoon of the 29th of May. . . . I immediately had Lieutenant Slocomb, who was the platoon leader at that time, make an inspection or investigation of the case for me and after a twenty-four hour period, I instruct-ed my Orderly Room to make out an entry that this man, Strong, would be reported as AWOL as of the approximate time he left the organization. . . . We did not make an extensive search of the area, in that he was not there for platoon call or company call the next morning. . . . The next time that I personally saw Strong was aproximately three and a half days later, after he was returned to the organization, or after he was taken to the 548th Engineer Service Battalion Stockade. . . . [R. 43]

• • • • • • • •

LO: . . . Just tell us when you next saw him.

A. Approximately three and a half days later. [R. 44]

• • • • • • •

Q. [President] What date was that, do you recall?

A. It must have been right around June 20th. . . . [R. 44]

• • • • • • •

Q. [Trial Counsel] Captain Tripp, did you authorize the accused to be absent from the 29th of May?

A. No, sir. [R. 44]

• • • • • • •

Q. [Trial Counsel] Captain Tripp, as commanding officer of the 595th Engineer Dump Truck Company, it is your duty to—and your responsibility to see that the morning reports are prepared for that organization. Is that correct?

A. Yes sir.

Q. Would you explain the discrepancy between Prosecution's Exhibit 1 and Defense's Exhibit A, for the satisfaction of the court?

A. There was an error made on the Morning Report for 31 May which showed Bell Bee Strong as being from duty to AWOL as of such and such an hour. The correction was made and we showed that the correction should have been made on the morning report of the 29th of May, showing that Bell Bee Strong was from duty to AWOL, and it was admitted, but actually, he should have been reported as AWOL on the 29th of May.

**635**

Q. I ask you, then, Captain Tripp, which of these documents is a true representation of the state of facts?

A. Prosecution's Exhibit 1 is the correct copy." [R. 47]

On the basis of the foregoing testimony appellate defense counsel contends that the evidence shows conclusively that neither Captain Tripp, nor any other person, had knowledge that accused was absent without leave until a company roll call was held on May 31, 1951. It is asserted that the only evidence tending to show unauthorized absence prior to May 31 took the form of an incomplete search of the area, which did not reveal accused's presence. It is, therefore, concluded that the entry showing the accused to have been in an absence without leave status on May 29 had no basis in fact, and was founded merely on an incomplete search plus ··speculation. Accordingly, it is urged that the evidence of record cannot establish the inception of the accused's unauthorized absence as of a period earlier than May 31, the date on which the accused was missing from roll call. We find no merit in this argument. It ▮ is well settled that a morning report excuted by a commanding officer of a unit is competent prima facie evidence of the facts or events recorded therein. Moreover, there is a presumption that records emanating from of- ▮ ficial unit sources are the records required by regulation to be kept, and that the recorder knew or had the duty to know or ascertain the truth of the matters reported. United States v. Masusock (No. 15), 1 USCMA 32, 1 CMR 32, decided November 9, 1951; United States v. Creamer (No. 179), 1 USCMA 267, 3 CMR 1, decided April 3, 1952. While it is true ▮ that the inception of petitioner's unauthorized absence was first recorded in the morning report of his company for May 31, 1951 (see Defense Exhibit A, supra), a correction was made at a later time (see Prosecution Exhibit 1, supra), and after it had been ascertained that the entry of May 31 was erroneous. The corrected morning report entry

**636**

clearly established the initial date of unauthorized absence to be May 29, 1951. We note that counsel has raised no question as to the reception of Prosecution Exhibit 1 either on the ground of lack of authentication, or because the officer who made the entry was not the official charged with the duty of knowing, or ascertaining, through customary and appropriate channels, the truth of the matters recorded. The only substantial question at this point, therefore, is whether the corrected morning report entry was competent, and constituted an acceptable representation of the facts. We note in this connection that when asked which of the documents constituted such a true representation, Captain Tripp replied that Prosecution Exhibit 1 was the correct and proper copy.

Special Regulations No. 345–400–1, paragraph 56, dated October 12, 1949, which were in effect at the time the entries in the instant case were made provide:

"A corrective entry will be made when an entry reported on a previous morning report is determined to be in error."

In United States v. Williams (No. 133), 1 USCMA 186, 2 CMR 92, decided February 21, 1952, we held a similar corrected morning report entry to be competent and admissible evidence, saying:

"We turn first to the question of the admissibility and competence of the morning report exhibit. The entry in question purports to be a correction of an earlier entry relating to the accused. The first entry was made under date of January 2, 1951, and listed the accused as missing in action as of November 30, 1950. Thereafter, on May 9, 1951, after the return of the accused to military jurisdiction, a correction was made, whereby the entry of January 2, 1951, was changed to AWOL as of November 30, 1950. Counsel for the appellant correctly contends that these entries are conflicting, but he also maintains that the entry of January 2, 1951, must be given more weight then the correcting entry of May 9, on the ground that it is obvious that the per-

son making the first entry had more accurate knowledge of the true facts, considering the time element and other factors involved. This does not necessarily follow. *The Regulations require that a corrective entry be made, when it is determined that a previous entry is in error. Of course the two entries in the exhibit are conflicting, and obviously so. However, the provisions for making corrected entries necessarily implies that such corrections will conflict, to a greater or lesser degree, with the entry corrected.* It would also appear to be implicit in such a provision for correction that there will be some delay in making such a correction.

". . . Based on all the evidence in this case, we certainly are not prepared to hold that the making of the corrected entry of May 9, 1951, was unreasonable or unauthorized, or that it was not admissible in evidence. . . ." [Emphasis supplied]

In the instant case a corrected entry was prepared for the purpose of showing that the accused in fact absented himself without leave on May 29, 1951. This entry was prepared after it was discovered that the previous entry, showing accused in an absence without leave status as of May 31, 1951, was in error. It follows from what has been said that Prosecution Exhibit 1 and the testimony of Captain Tripp were competent to establish the inception of the accused's unauthorized absence on May 29, 1951.

Appellate defense counsel also challenges the sufficiency of the evidence to sustain the finding of guilty of absence without leave █ for the period alleged on the ground that the very testimony of Captain Tripp operated to rebut the prima facie showing, arising from Prosecution Exhibit 2, that accused's unauthorized absence terminated on June 18, 1951. An examination of the testimony of this witness, pertinent portions of which have been set out earlier in this opinion, discloses that on direct examination by the law officer, Captain Tripp, after first stating that accused absented himself without leave on May 29, 1951, testified that he next saw the accused "three and a half days later." Asked again when he next saw accused, the witness stated that it was three and one-half days later, after petitioner "was returned to the organization, or after he was taken to the 548th Engineer Service Battalion Stockade." The president of the court inquired as to the date of that meeting, and Tripp replied that it was "right around June 20th." Prosecution Exhibit 2, a duly authenticated extract copy of the morning report of accused's company for June 18, 1951, contains an entry showing a change in accused's status from absent without leave to confinement in the post guardhouse, Headquarters 548th Engineer Service Battalion. On the basis of the captain's testimony, it is urged that the maker of these morning reports by his own testimony repudiated, contradicted, and conclusively rebutted the prima facie presumption that the entries in these documents were correct. It is, therefore, contended that the evidence is insufficient to sustain the findings of guilty of absence without leave for the period alleged in the specification. We cannot accept this argument. Although a reading of the record shows conflict between portions of the testimony of this witness and the morning report entry, the court could properly have accepted the morning report entry and disregarded his testimony. It is universally recognized that █ the weight of the evidence and the credibility of witnesses is a matter for the triers of fact to determine. See Manual for Courts-Martial, United States, 1951, paragraph 74a. While expressing no view in the matter, we observe that it would not have been unreasonable for the members of the court-martial to have interpreted the testimony to mean that the witness next saw the accused three and one-half days after he was taken to the 548th Engineer Service Battalion Stockade. Moreover, the captain could well have intended to say three and one-half weeks rather than days. Either of these interpretations would establish the date when next the accused was seen

**637**

near June 20. The captain explicitly stated that he next saw the accused near that date. In any event, we are of opinion that the discrepancy in the witness' testimony in this case went merely to the weight of the morning report evidence and not to its admissibility. It follows that we find the evidence sufficient to sustain the finding of guilty of absence without leave from about May 29, 1951, to about June 18, 1951.

### VII

Although not specified in our grant of review, a further issue has been raised in briefs and oral ■■■■■■ ■ argument to which we now direct our attention. The Government contends that, even though the findings of guilty of voluntary manslaughter be not supported, the sentence imposed in this case should stand if there is substantial evidence to sustain the findings of guilty of absence without leave. This is based on the proposition that, when an accused has been convicted under several charges, and a sentence not exceeding that permissible under a single charge has followed, that sentence must stand if supported by a valid conviction under a single charge, regardless of infirmities in the others, and regardless of whether the trial court would, in fact, have imposed that sentence had it recognized the presence of other infirmities. In the case at bar, the findings of guilty of absence without leave amply support the sentence to six years confinement with accessories adjudged by the court-martial. The general proposition stated above, together with others, was considered by us at length in United States v. Keith (No. 226), 1 USCMA 442, 4 CMR 34, decided July 3, 1952, and reference is made to that opinion for a full expression of our views in these premises. It is obvious that in the instant case, no agency with authority to do so has determined whether the sentence adjudged on the basis of both sets of findings of guilty is appropriate,

as well as legal, for the single valid finding of guilty of absence without leave. As we noted in United States v. Keith, supra, we possess no power to determine this question. We are, therefore, required by Keith to reject this Government contention.

### VIII

For the reasons stated, the decision of the board of review is reversed as to the specification of the second charge. However, its decision as to the specification of Charge I is affirmed. In view of our holding on the second assignment of error, it is unnecessary that we consider the first. The case is remanded to The Judge Advocate General, United States Army, for reference to the board of review for determination of adequacy of sentence, or for other action not inconsistent with this opinion. See Uniform Code of Military Justice, Articles 67(e) and (f), supra; United States v. Keith, supra.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting in part and concurring in part):

I dissent from that part of the Court's opinion which holds there was material prejudice because the law officer failed to give more adequate instructions. I concur in the remaining portions.

The Court's opinion does not fully develop the manner in which the elements of the offense of voluntary manslaughter were called to the attention of the court-martial. However, this is of little importance in view of the rule announced in United States v. Gilbertson (No. 318), 1 USCMA 465, 4 CMR 57, decided July 22, 1952. The principles herein discussed are similar to those advanced in that case and my reasons for dissenting are substantially set forth therein. No good purpose would be served by repeating them.